WESTERN UNION TELEGRAPH CO. v. WILSON.

(Court of Civil Appeals of Texas. Dallas. Jan. 4, 1913. Rehearing Denied Jan. 25, 1913.)

1. TELEGRAPHS AND TELEPHONES (§ 37*) — FAILURE TO DELIVER MESSAGE—EXCUSE.

That the addressee lived at C. and the telegrams were sent to him at O. did not excuse a nondelivery, where C. was less than a mile from the station at O., and had no station of its own, and its inhabitants got their mail and transacted their business at O. and the two places were in effect one village, though formerly C. was a separate village.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 23, 24, 29, 30, 32; Dec. Dig. § 37.*]

2. TELEGRAPHS AND TELEPHONES (§ 37*) — FAILURE TO DELIVER MESSAGE—EXCUSE— FREE DELIVERY LIMITS.

That the addressee lived beyond the free delivery limits did not relieve the telegraph company from its duty to exercise ordinary diligence to deliver telegrams, where it made no demand either upon the sender or the addressee for extra charges for delivery; the effect of the free delivery rule being merely to define the limits within which the company undertakes to deliver messages without charge, and not to lessen its obligation to deliver messages.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 23, 24, 29, 30, 32; Dec. Dig. § 37.*]

3. TELEGRAPHS AND TELEPHONES (§ 74*) — FAILURE TO DELIVER MESSAGE—INSTRUCTIONS—EVIDENCE.

Where, in an action for delay in delivering two telegrams, the evidence in addition to showing that, though the addressee lived outside of the free delivery limits, no demand was made upon the sender for extra charges, also showed that the addressee after the arrival of the messages and on the same day spent about 3½ hours at public places within the free delivery limits, and was well known there, it was proper to instruct to find for plaintiff if defendant failed to exercise such diligence in an effort to find plaintiff and deliver the messages as a reasonably prudent person would have exercised under like circumstances.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 77; Dec. Dig. § 74.*]

4. TRIAL (§ 252*) — INSTRUCTIONS — APPLICATION TO CASE.

Where, in an action for delay in delivering telegrams to an addressee who resided beyond the free delivery limits, there was no evidence of a demand to pay the extra charges, it was not error to refuse to instruct that the fact that some messages were delivered outside such limits would not amount to an abrogation of the free delivery rule.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 505, 596–612; Dec. Dig. § 252.*]

5. APPEAL AND ERROR (§ 1067*)—HARMLESS ERROR—REFUSAL TO INSTRUCT—TELEGRAPHS AND TELEPHONES.

In an action for delay in delivering telegrams, the refusal of an instruction on what will constitute an abrogation of the free delivery rules, if error, is harmless, where the uncontradicted evidence shows that the addressee was within the free delivery limits for 3½ hours after the messages were received, and that the messages could have been delivered to him in the exercise of ordinary diligence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4229; Dec. Dig. § 1067.*]

6. TRIAL (§ 260*)—INSTRUCTIONS—REQUESTS.

In an action for delay in delivering telegrams resulting in the addressee's failure to attend his mother's funeral, an instruction that plaintiff would be entitled to recover for mental anguish proximately resulting from the defendant's negligence, if as a proximate result of such negligence he "was prevented from attending his mother's funeral," sufficiently confined the jury to a consideration of only such suffering as resulted from his being unable to attend the funeral, and hence it was not error to refuse defendant's requested instruction that plaintiff could not recover for such damages as would naturally grow out of the news of his mother's death.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. § 260.*]

7. APPEAL AND ERROR (§ 1056*)—HARMLESS ERROR—EXCLUSION OF EVIDENCE.

In an action for delay in delivering telegrams, the facts that no demand was made for charges for delivering them beyond the free delivery limits, that with reasonable diligence the telegrams could have been delivered to the addressee within such limits, and that the substance of the free delivery rule was testified to by defendant's witnesses without objection, each rendered harmless the court's refusal to permit the defendant to read to the jury the printed provision on the back of the telegram that delivery would not be made outside of the fixed free delivery limits except at the sender's request and cost.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4187–4193, 4207; Dec. Dig. § 1056.*]

8. TELEGRAPHS AND TELEPHONES (§ 71*) — DELAY IN DELIVERING MESSAGE—EXCESSIVE RECOVERY.

In an action for negligent delay in delivering telegrams resulting in the addressee's failure to attend his mother's funeral, an award of $500 was not excessive, though the plaintiff stated that he did not visit his mother's grave while in the vicinity because he did not want to do so; such statement not necessarily showing want of a proper degree of filial love and respect.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 74; Dec. Dig. § 71.*]

Appeal from District Court, Dallas County; E. B. Muse, Judge.

Action by E. L. Wilson against the Western Union Telegraph Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Geo. H. Fearons, of New York City, and N. L. Lindsley, of Dallas, for appellant. G. W. Hardy, of Shreveport, La., and Gibson & Calloway, of Dallas, for appellee.

RASBURY, J. Appellee sued appellant in the district court of Dallas county to recover damages for delaying the transmission and delivery of two telegrams, one forwarded from Houston, Tex., and one from Aquilla, Tex., announcing the death of his mother, and inquiring whether he would attend the funeral and recovered verdict and judgment for $500, from which this appeal was taken.

The petition charged that appellant accepted both telegrams, and agreed and contracted to use ordinary care in the transmission and delivery of the same, but that it failed to do

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

so. It was charged that, if such care had been observed, said telegrams would have been delivered to appellee at such time as to have enabled him to attend the funeral of his mother, which he would have done but for the delay. The answer of appellant to the charge of negligence was (a) general denial; (b) that appellee did not reside in Oil City on the day the telegrams were received, and for that reason appellant could not deliver same; and (c) that the messages were received and forwarded by appellant on the express understanding that same were to be delivered only within the appellant's free delivery limits without which appellee resided. By supplemental plea appellee urged among other things, in response to appellant's defenses as above outlined, that on April 19, 1911, he was as matter of fact within the appellant's prescribed free delivery limits in Oil City, and that by the exercise of due diligence said messages could have been delivered on said date in said limits, but that appellant inexcusably neglected to do so in disregard of its duty, and instead held the messages until the forenoon of April 21, 1911, and then deposited same in the United States mail for delivery.

As material to the determination of the appeal, the undisputed facts, as well as the disputed one resolved by the jury in favor of appellee, show that appellee on April 19, 1911, resided in Caddo, La., a small village or settlement on the line of the Kansas City Southern Railway. Some time before the date named oil fields were discovered in the vicinity of Caddo, and as a result the town of Oil City came into existence on the line of the said Kansas City Southern Railway about three-fourths or one-half mile south of Caddo. Oil City has a population of approximately 700 or 1,000 people, and is such a village as its population indicates, having a depot, post office, and a number of stores. The growth of Oil City has been north towards the old village of Caddo. At the time mentioned the latter village consisted of only a single store, a section house, and two or three other houses. As one witness put it, "when they opened up the oil fields, they moved it (Caddo) three-quarters of a mile south down the track." At the time appellant received the messages, appellee, who was a well driller, made his home at the boarding house of Mrs. J. A. Walker, in the old village of Caddo. Appellee was well acquainted in Oil City, and received mail from the post office there almost daily under the name of E. L. Wilson and Ed L. Wilson, and knew the postmaster and his assistant during the entire time he had resided in Caddo. Appellee customarily went to the depot at Oil City four or five times a week, going sometimes for freight and sometimes for express matter, and sometimes, as he puts it, to see who came in on the train as people will do at small places. On said April 19, 1911, at 9:35

a. m., appellant received over its wires from Houston, Tex., a telegram directed to appellee reading: "Come at once. Mother died this morning at Aquilla, Texas. Answer." This telegram was signed by S. L. Wilson, a brother of appellee. Another telegram was received from Aquilla, Tex., by appellant on the same day at 9:50 a. m. addressed to appellee, reading: "Mother died this morning. Answer if coming." The last telegram was signed by J. E. Hancock, appellee's stepfather. Appellee's mother, as the telegrams indicated, died early in the morning of April 19th, the day both telegrams were received by appellant at Oil City. She was buried at Scott's Chapel graveyard, 3½ miles southeast from Aquilla, in Hill county, Tex., about 5 o'clock of the afternoon of the next day, or April 20th. Had the telegrams been delivered at any time during the day of the 19th, appellee could and would have been able to attend his mother's funeral. The telegrams were not delivered to appellee on that day, in fact not until about 9:20 a. m. of April 21st, and then through the post office, where he had called for mail. Immediately upon receipt of the telegrams, he wired to Aquilla that he would be there as quick as he could get there. He did go to Aquilla, but was too late; his mother having been buried the afternoon of the day before. Bearing on the diligence of appellant to find appellee and deliver the messages, appellee testified, and was strongly corroborated in that respect by other witnesses and not contradicted by appellant, except circumstantially, that he had a broad acquaintance in Oil City, as well as in a radius of 20 miles thereabouts; that in the forenoon of April 19, 1911, he was in Oil City, and remained there until 1:30 in the afternoon; that he visited the post office (which was about 300 feet from the telegraph office), the depot, different hardware and supply houses, and a barber shop, where he procured a shave and hair cut. He also testified that the business part of Oil City is in close proximity to the office of appellant and surrounds it, that the town contains about two dozen business places, and that there is no definite line of demarcation between Caddo and Oil City, houses being scattered up and down the railroad between the two. He also testified that the appellant on a former occasion had delivered him a telegram addressed to him at Oil City, at which time he was at work on a well about a mile distant from the well on which he was working at the time the company received the telegrams announcing the death of his mother. J. E. Brown testified that appellee came into the oil fields about seven years prior to the date of the trial, and has been with the oil gang since; that he has seen him mixing and mingling with the people in Oil City, and that he was in town an average of three days out of the week; that there was scarcely any one in Oil City that did not know him. H. S. Morse,

assistant postmaster at Oil City at the time the messages were received, testified that he knew appellee, and that he was well known to the people of Oil City. Dr. P. T. Alexander testified, in substance, to the same facts that the witness Morse did, and added that every time he saw Wilson in town people were around him that seemed to know him. August Costalka testified that he was a barber and lived in Oil City and knew appellee April 19, 1911, and saw him in town on that date. Edwin Rabun, station agent and telegraph operator for appellant who received the messages in question, testified that the first effort made to locate appellee was about 11:30 o'clock a. m. on the day the same were received, and that the effort consisted of inquiry at the post office, and that, while he did not recall of whom he inquired, he got no information; that at noon he inquired of the proprietor of the hotel where he resided if he knew anything of appellee, and that he made no further inquiry; that he checked off at 2 or 2:30 o'clock from his duties and called the attention of Mr. Coffey and Mr. Sledge, coemployés in the office, to the fact that there was a death message in the office, but did not remember that he said there were two such messages; that he resumed his duties the same evening at 7 o'clock, and does not recall doing anything that night in an attempt to deliver the messages, nor did he send a service message to the senders in either message; that he remained on duty and in sole charge of the wire until 2:30 a. m. W. T. Coffey, appellant's agent and manager, and whose duty it was to deliver the messages or see that the operators or clerks did so, testified that the first he knew of the messages being in the office was about 7 o'clock p. m. of the day the same were received, at which time they had not been delivered; that Rabun was on duty from 8 a. m. until about 2 or 2:30 p. m. when he was relieved by Sledge, who remained on until about 6 p. m., when he was, in turn, relieved by Rabun; that, after learning of the presence of the messages, he did not send a service message requesting a better address to either of the senders; that he recognized the importance of the messages as soon as he saw them, and knew that they were messages intended to notify a son of the death of his mother. W. L. Sledge, appellant's agent who relieved Rabun after the telegrams were received, testified that he mailed the telegrams to appellee at 9 a. m. April 21, 1911, and that he mailed them because he was not able to deliver them; that he took the messages with others out of the office about 3 o'clock p. m. of April 19, 1911, the day they were received, for delivery; that his efforts to deliver consisted of inquiring for appellee at several of the stores and the post office, the asking of several prominent business men, perhaps 25 in number, in Oil City if they knew appellee, but could not recall who the men were; that, when he went out in an attempt to deliver the messages, he looked at the clock which indicated 3 p. m., and that that was the first time he had taken the same out for that purpose and was the first he knew of any attempt to deliver same; that he went out again in the afternoon of the 20th, and tried to locate appellee, but was unable to do so.

It was shown by appellant's rules that in cities under 5,000 population telegrams would be delivered free within one-half mile from appellant's office, and that beyond that radius delivery would be made upon payment of the actual reasonable cost of delivery, and it seems that Caddo, where appellee resided, was without the limit, and it also seems that appellant's rule in reference to free delivery was in force in Oil City, but it also appears that no demand was made upon the senders for extra charges. Considerable testimony was adduced tending to show that it was the custom of appellant not to observe its free delivery limits in Oil City, enough, perhaps, to sustain any implied finding of the jury to that effect. However, we have not considered that issue since it is not necessary to a determination of the case.

[1-3] The first assignment of error complains of that portion of the charge of the court which told the jury: "If you believe from the testimony that the defendant * * * exercised such diligence in the premises as a reasonably prudent person under the same or similar circumstances would have exercised to find the plaintiff and deliver the messages, then you will find for the defendant. If, on the other hand, * * * you find from the evidence that the defendant failed to exercise such diligence in an effort to find the plaintiff and deliver the messages as a reasonably prudent person would have exercised under the same or similar circumstances, then you will find for the plaintiff." The criticism of the charge is that it made it the unconditional duty of appellant to find appellee and deliver the messages to him, even though he resided in Caddo, and not Oil City, whereas the terms of the messages only required a delivery in Oil City, and the duty to deliver there was limited to appellant's free delivery limits in said Oil City. In response to the propositions asserted above, it may be said that, under the evidence shown by the record, it was the duty of appellant to exercise reasonable diligence to deliver the messages to appellee at either Caddo or Oil City. Caddo was not a town or village independent of Oil City. It had no railway station, post office, and telegraph station. Its inhabitants received their mail and their telegrams from the post office and telegraph station in Oil City. Persons desiring to journey from Caddo, so far as the testimony discloses, would be compelled to board the cars at Oil City. But little business was transacted there; it having followed the railroad

station and the new town of Oil City. At most, and so far as appellant was concerned, in its duty to exercise ordinary diligence to deliver the two telegrams Caddo can only be said to be without the free delivery limits of Oil City as fixed by appellant. The excuse for not delivering the telegrams in Caddo, under the testimony showing the relation of that village to Oil City, cannot be based upon the circumstance that it was formerly a separate village, but can only be based upon the fact that the inhabitants are without the free delivery limits of Oil City, for it is conceivable that appellant's free delivery limits as applied to large cities, say, might include within its limits more than one neighborhood bearing a name distinct from that of the office at which the telegram was received. The rule offered in evidence by appellant does not contemplate the distinction sought to be drawn by counsel, since it simply provides that the free delivery limits as applied to Oil City shall be a radius of one-half mile from its office. By the said rule it does undertake to deliver messages beyond the prescribed limits, but reserves the right before doing so to collect, presumably from the sender, the reasonable cost of the delivery beyond its free limits, showing, in our opinion, an intention at all times to deliver beyond the free delivery limits. Such limits do not as matter of law circumscribe the duty or lessen the obligation of appellant to deliver the message, if it can be done by the exercise of ordinary care, but merely defines the limits in which it undertakes to deliver messages without charge to its patrons. Our appellate courts have so construed the regulation, and the regulation by its terms comprehends nothing less. Telegraph Co. v. Teague, 8 Tex. Civ. App. 44, 27 S. W. 958; Telegraph Co. v. Ayres, 47 Tex. Civ. App. 557, 105 S. W. 1165; Telegraph Co. v. Shockley, 57 Tex. Civ. App. 30, 122 S. W. 945. The evidence shows that no demand was made by appellant of either the sender of the messages or the addressee for additional charges, and, until such demand was made, appellee's residence without the free delivery limits affords no excuse for nondelivery of the messages, and it was negligence to refuse to do so. Telegraph Co. v. Teague, supra; Telegraph Co. v. Ayres, supra; Telegraph Co. v. Harris, 132 S. W. 876.

While we have shown that Caddo under the testimony was in no sense a separate and distinct village or township, but for all intents and purposes a part of Oil City, and have also shown that because appellant's free delivery limits did not reach the residence of appellee that appellant was nevertheless bound to use ordinary care in an attempt to deliver the message, and have also shown that appellant failed to demand of the sender any additional charges for delivery outside of its fixed free delivery limits, and that such omission is negligence and affords no excuse for nondelivery of the messages, and that as a result the charge of the court is not erroneous, it may also be further said that the uncontradicted testimony shows that appellee on the day appellant received both messages was within appellant's free delivery limits and in close proximity to appellant's office from the time appellant received the messages until 1:30 in the afternoon, and that by the exercise of ordinary care appellant could have delivered same. It was so charged by the pleading of appellee, and his testimony is directed largely in that direction, although it sustains in all particulars the finding of the jury against the appellant on the other features of its defenses. Hence the case really stands, under this assignment, stripped of all questions but that of the exercise of ordinary diligence by appellant to find appellee and deliver to him the messages on the morning they were received, within the three and one-half hours spent by him in Oil City. The charge complained of simply and tersely submits that issue to the jury, and it seems to us is not subject to the criticism directed against it.

[4, 5] The eighth assignment of error complains of the refusal of the court to instruct the jury that appellant had the right to establish limits within which it would only deliver messages free of charge, and that if they believed such limits had been fixed in Oil City by appellant, and were observed by appellant's agents, the fact that some messages were delivered outside said limits for the accommodation of the public would not amount to an abrogation of the rules. Without reference to the theoretical correctness of the requested charge, and notwithstanding appellee did introduce testimony tending to show that appellant did not observe its free delivery limits, but delivered messages outside of same, we are of opinion there was no error in refusing the charge. The evidence fails to disclose a situation entitling appellant to have the regulation with reference to free delivery limits applied as an excuse for a failure to exercise ordinary care. Without objection appellant was permitted to prove the fixed free delivery limits, and that appellee lived without same. The next step would have been to prove the refusal of the senders to pay any extra charges, which the regulation provided should be paid before delivery without the limits. This was not done, and, until it was, the charge should not have been given. Another reason why the refusal of the charge in our opinion was harmless is that under the undisputed facts appellee was, as we have said, within appellant's free delivery limits for 3½ hours after the messages were received, and appellant could have delivered the messages to him by the exercise of ordinary diligence, and, since the verdict of the jury can be sustained on that ground, the question presented by the requested charge becomes further immaterial.

What we have just said applies also to the

propositions asserted by appellant under its third and fourth assignments of error, pertaining also to the appellant's duties within its fixed free delivery limits.

[6] By its fifth assignment of error appellant complains of the refusal of the trial court to allow to be read to the jury the following special instruction: "In this case you are instructed that the plaintiff is not entitled to damages, even though the defendant should be proven negligent for such damages as would naturally flow or grow out of the news of his mother's death." The purpose of this instruction was to have the trial judge present to the jury the rule of law that the appellee was not entitled to recover any damages for suffering that would naturally have resulted from the death of his mother, such suffering as he would have undergone, even though the messages had been promptly delivered, but could only recover for such suffering as he underwent by being deprived of the opportunity of attending the funeral of his mother, brought about by the failure of appellant to deliver the messages. In the case of Telegraph Co. v. Smith, 30 S. W. 937, this court held that an instruction which told the jury that the plaintiff in addition to the cost of the messages and any sum expended in reaching his father would be entitled to recover for the mental anguish suffered, "by reason of being deprived of the privilege of being with his father at the time of his death," sufficiently distinguished between the natural sorrow in such misfortunes and that superinduced by the negligence of the telegraph company in failing to deliver the message promptly, although the conclusion of the court is based rather upon the idea that the failure to give a requested charge more clearly presenting the issue was harmless than that there would have been any impropriety in allowing the charge. In this case the trial judge told the jury if they believed the appellant was negligent in the transmission and delivery of the messages, and "you further find and believe that as a proximate result of such negligence by the defendant, if any, plaintiff was prevented from attending his mother's funeral and burial, then, if you (so) find and believe from all the evidence before you, the court instructs you that the plaintiff would be entitled to recover damages against the defendant for the mental anguish suffered by plaintiff, if any, proximately resulting from the negligence of defendant, if any." In the Smith Case, supra, the words, "deprived of the privilege of being with his father at the time of his death," are held to exclude any natural sorrow or to at least circumscribe and narrow the matter to such limits as to be harmless. Such being true, it occurs to us that the charge in this case which tells the jury that if by the negligence of appellant the messages were not delivered, and whereby "plaintiff was prevented from at-

tending his mother's funeral and burial," comes fairly and well within the rule and confined the jury to only such suffering as resulted to appellee from being unable to attend the funeral, and, that as a consequence the jury did not consider appellee's natural sorrow resulting from his mother's death, but only that superinduced by being deprived of the privilege of attending her burial.

It is proper to say here that appellee presents no counter propositions to appellant's second, third, fourth, fifth, and sixth assignments of error, which we have considered, but insists that same should not be considered for the reason that in the preparation and presentation of its appeal appellant has ignored the new rules now in force and promulgated by the Supreme Court. At the time this case was tried and the record was made up the old rules were in force and under which questions affecting the charge of the court or its refusal of special charges as well as the admissibility of testimony were not required to be set out in full in the motion for new trial, but could be raised by particular reference to the charge or bill of exception.

[7] The sixth assignment of error complains of the refusal of the trial judge to permit appellant to read to the jury the printed matter on the back of the telegram sent by J. R. Hancock from Aquilla, Tex., to appellee, which provides that appellant will not deliver messages without its fixed free delivery limits, except at sender's request and at reasonable cost. While we can see no objection to the admission of the printed portion of the telegram, and hold it should have been admitted in testimony, still we do think its exclusion immaterial, for the reasons that no demand was made for additional fees and until such demand was made the fact that appellee was without appellant's free delivery limit afforded no excuse for nondelivery; in addition, it is not disputed that appellee was within the appellant's delivery limits for a period sufficient in which to have made delivery; and, finally, appellant did by its witnesses and by the introduction of rule 50 prove in substance and without objection what it sought to prove by the said printed matter.

[8] The seventh assignment of error asserts the proposition that the verdict is shockingly excessive and wholly disproportionate to any injury alleged or proven, and is so because of the admission by appellee upon trial that though he has visited Aquilla, four miles beyond which his mother is interred, he did not visit her grave, and that the reason he did not was because he did not want to do so. This admission is the sole reason urged as evidencing the excessiveness of the verdict. We do not think such admission warrants the exercise of the narrow and circumscribed option of this court in disturbing the verdict of the jury.

· The amount of the verdict is $500, a sum in our opinion not so shockingly excessive as to warrant us in substituting our judgment for that of the jury, who were privileged to hear the testimony. The fact that the witness said that he did not want to visit his mother's grave is susceptible of more than one construction. Some natures capable of the deepest and tenderest and most lasting affection will shirk contact with the dead, and avoid the grave that contains loved ones. There is nothing to indicate what the appellee meant by his statement, and, since the jury attributed to him a proper degree of filial love and respect, we do not care to disturb their findings.

Finding no reversible error in the record, the judgment is affirmed.